UNITED STATES of America,

v.

Randolph WILLIAMS, Appellant.

No. 85–6082.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 14, 1986.

Decided July 7, 1987.

Sean Connelly (appointed by this Court), for appellant.

Lee F. Satterfield, Asst. U.S. Atty., of the Bar of the District of Columbia, pro hac vice by special leave of Court, with whom Joseph E. diGenova, U.S. Atty., and Michael W. Farrell, Thomas J. Tourish, Jr., and Barry M. Tapp, Asst. U.S. Attys., were on the brief, for appellee.

Before ROBINSON and BORK, Circuit Judges, and WRIGHT, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge ROBINSON.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

Randolph O. Williams appeals from his conviction for possession of a controlled

substance with intent to distribute it.[1] He first contends that the District Court erred in denying his motion to suppress the introduction of heroin found on his person—the basis for his conviction—on the ground that police officers impinged on his Fourth Amendment rights in searching for and seizing it. He also protests the court's denial of his motion for a mistrial, by which he claimed prejudice from remarks made by a defense witness to three jurors after the case had been submitted for deliberation. We affirm.

## I. THE MOTION TO SUPPRESS

### A. *Background*

The events leading to discovery of the heroin in Williams' possession stand uncontradicted on the record before us.[2] Williams was in the driver's seat of an automobile parked curbside on Douglas Street, Northeast, in Washington, D.C.,[3] one afternoon[4] when four officers of the Park Police Narcotics Unit traveling in an unmarked van[5] drove alongside the car and stopped.[6] Also present in Williams' automobile were two women, one seated adjacent to him in the front of the passenger compartment and the other in the back.[7] According to Sergeant Henry A. Berberich and Officer Robert J. Kass, the two officers who testified at the suppression hearing, as the van approached from behind the officers' attention was drawn to the car because the driver and front-seat passenger were "bent over"[8] and apparently concentrating on "something in their laps."[9] On the basis of their experience in investigation of narcotics offenses[10] and the fact that the car was parked in an area known for extensive drug usage,[11] the officers suspected "some kind of narcotics violation."[12]

As Berberich and Kass exited from the van and approached the driver's side of the car, they saw Williams "shove[ ]"[13] a "brown object"[14] or "paper bag"[15] in his right hand "underneath his leg."[16] Berberich, who like Kass was not in uniform, identified himself as a police officer, dis-

1. See 21 U.S.C. § 841(a) (1982).

2. Williams presented no evidence at the hearing conducted by the District Court on his motion to suppress. The Government called as witnesses two of the arresting officers, Sergeant Henry A. Berberich and Officer Robert J. Kass, both of the Park Police. Thus our account of the incident is derived wholly from the officers' testimony.

3. Transcript of Proceedings (Tr.) 7–8, 10 (testimony of Sergeant Henry Berberich); Tr. 30 (testimony of Officer Robert Kass).

4. Tr. 6 (testimony of Sergeant Berberich); Tr. 30 (testimony of Officer Kass).

5. Tr. (testimony of Sergeant Berberich).

6. Tr. 10–11 (testimony of Sergeant Berberich).

7. Tr. 10 (testimony of Sergeant Berberich).

8. Tr. 9 (testimony of Sergeant Berberich). Berberich stated that the officers initially noticed them in this posture from approximately twenty to thirty feet behind the car. Tr. 9 (testimony of Sergeant Berberich).

9. Tr. 31–32 (testimony of Officer Kass); see also Tr. 10 (testimony of Sergeant Berberich) (Williams and the frontseat passenger were "bent over something with their eyes focused down instead of focused straight ahead").

10. Berberich testified that he had been a Park Police officer for ten years, and that narcotics investigations had comprised approximately one-third of his total workload during that period. Tr. 6. Kass avowed that he had spent more than a year in narcotics enforcement and had completed a number of training programs dealing therewith. Tr. 29.

11. Kass, who for six years as a uniformed patrolman had been assigned to a "beat" in the area of the arrest, testified that the area was known for "[e]xtremely high [drug] sales and usage." Tr. 29. Berberich testified that the car was parked "a couple [of] blocks" from the spot on Quarles Street with the heaviest narcotic activity, Tr. 27–28, and that the Douglas Street area is the site of significant "overflow. You get the people that buy the dope [on Quarles Street,] and they just travel a couple blocks to shoot up." Tr. 28. He further testified that drug use on Douglas Street often occurs in cars. Tr. 28.

12. Tr. 31 (testimony of Officer Kass).

13. Tr. 11 (testimony of Sergeant Berberich).

14. Tr. 32 (testimony of Officer Kass).

15. Tr. 11 (testimony of Sergeant Berberich).

16. Tr. 11 (testimony of Sergeant Berberich).

played his badge, and asked to see Williams' driver's license and vehicle registration.[17] With Berberich and Kass both standing on the driver's side of the car,[18] Williams began to look for the registration.[19] Berberich noticed that Williams "kept his legs really closed tight" in order to hide the bag underneath.[20]

Kass testified that he then asked Williams to step out of the car[21] because he believed that the bag might contain a weapon.[22] As Williams alighted from the vehicle, he put his right hand under his leg and "attempted to flip" the bag into the back of the car.[23] The bag hit the driver's seat, and fell back into the front of the passenger compartment.[24]

Berberich testified that he then advised Kass of Williams' attempts to dispose of the bag.[25] Kass picked it up and felt it "with both hands"[26] while Berberich monitored Williams.[27] Kass avowed that when he touched the bag he could "feel that

inside were numerous small rolled-up objects"[28] that "felt like plastic baggies."[29] Kass further testified that on the basis of this touching of the bag and his experience and training in narcotics detection,[30] he "believed"[31] that inside the paper bag were "numerous quarter bags of heroin."[32] He then proceeded to open the bag and found "five large baggies with 44 small baggies" containing heroin.[33] Williams was then placed under arrest.[34]

■ Williams moved to suppress the introduction of the heroin into evidence,[35] and the District Court conducted a hearing on the motion before commencing trial.[36] Following testimony by the two officers, the court expressed doubt as to whether they had acted properly in approaching the car and questioning Williams.[37] After hearing additional argument on the lawfulness of the initial interception, however, the court denied the motion to suppress.[38] We turn now to an analysis of this disposition.[39]

17. Tr. 11 (testimony of Sergeant Berberich).

18. Tr. 13 (testimony of Sergeant Berberich).

19. Tr. 11 (testimony of Sergeant Berberich).

20. Tr. 11 (testimony of Sergeant Berberich).

21. Tr. 32 (testimony of Officer Kass). The two passengers were also asked to step out. See Tr. 13 (testimony of Sergeant Berberich).

22. Tr. 33 (testimony of Officer Kass); see also Tr. 12 (testimony of Sergeant Berberich) (in light of Williams' "gestures" and "the way he placed the bag," Berberich asked him to leave the car "for [the officer's] own safety").

23. Tr. 12 (testimony of Sergeant Berberich).

24. Tr. 13 (testimony of Sergeant Berberich).

25. Tr. 13 (testimony of Sergeant Berberich). Kass testified that he also had observed Williams' attempt to toss the bag in the back seat. See Tr. 33.

26. Tr. 33 (testimony of Officer Kass).

27. Tr. 33 (testimony of Officer Kass).

28. Tr. 33 (testimony of Officer Kass).

29. Tr. 33 (testimony of Officer Kass).

30. Kass testified that he had felt drugs packaged in this fashion on prior occasions. Tr. 33.

31. Tr. 34 (testimony of Officer Kass).

32. Tr. 32 (testimony of Officer Kass).

33. Tr. 32 (testimony of Officer Kass).

34. Tr. 14 (testimony of Sergeant Berberich).

35. Motion to Suppress, *United States v. Williams,* Crim. No. 85–520 (D.D.C.) (filed Aug. 27, 1985).

36. Tr. 3–77.

37. See, e.g., Tr. 65 ("[m]y problem is [the officers'] going to the car in the first place"). On appeal, Williams does not challenge the propriety of the initial encounter. See text *infra* at note 43.

38. Tr. 77.

39. The Federal Rules of Criminal Procedure provide that "[w]here factual issues are involved in determining a motion, the court shall state its essential findings on the record." Fed.R. Crim.P. 12(e). The District Court plainly did not do so ostensibly because Williams did not request factual findings. Nor did Williams object to the court's noncompliance with Rule 12(e), or even raise the matter before us. Under these circumstances any objection that Williams might have predicated on Rule 12(e) has been waived, *United States v. Allen,* 203 U.S.App.D.C. 17, 23 n. 5, 629 F.2d 51, 57 n. 5 (1980); 8 J. Moore, Moore's Federal Practice § 12.04[1] at

## B. *The Seizure of the Bag*

Although the better part of argument during the suppression hearing centered on the lawfulness of the officers' action in approaching the parked car to question Williams,[40] he now concedes its legality.[41] Furthermore, Williams apparently does not challenge the propriety of the officers' directive that he alight from the car.[42] Williams does maintain, however, that Kass' removal of the bag from the car was an unconstitutional seizure, and his subsequent treatment of the bag an unconstitutional search of its contents.[43]

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures...."[44] A seizure occurs "when there is some meaningful interference with an individual's possessory interests" in tangible personal property.[45] Seizures conducted without benefit of a warrant are "per se unreasonable" unless one of the exceptions to the warrant requirement is applicable.[46]

The Government contends that Kass' warrantless handling of the bag did not contravene the Fourth Amendment[47] since it was within the range of activity sanctioned by the Supreme Court in *Terry v. Ohio*[48] and its progeny.[49] These cases hold that a limited investigative stop of a person is reasonable under the Fourth Amendment when the officer is " 'able to point to specific and articulable facts which, taken with rational inferences from those facts,' give rise to a reasonable suspicion that the individual is, was, or is about to be engaged in criminal activity."[50] The *Terry* Court further held that if a police officer conducting a valid investigative stop possesses a "reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search ... of such persons in an attempt to discover weapons which might be used to assault him."[51] Although the weapons search authorized in *Terry* was confined to a patdown of the suspect's "outer clothing,"[52] the Supreme Court held in *Michigan v. Long*[53] that an officer making an investigative stop of a suspect in a car enjoys greater latitude. Under *Long*, if the officer has a reasonable belief that the suspect is dangerous, he may conduct a protective search of all of those areas of the passen-

---

12–40 (2d ed. 1984), and the court's ruling is to be upheld on appeal "if there is any reasonable view of the evidence that would support it." *Scarbeck v. United States,* 115 U.S.App.D.C. 135, 151, 317 F.2d 546, 562 (1962), *cert. denied,* 374 U.S. 856, 83 S.Ct. 1897, 10 L.Ed.2d 1077 (1963); see *United States v. Allen, supra,* 203 U.S.App. D.C. at 23 & n. 5, 629 F.2d at 57 & n. 5.

**40.** See Tr. 47–77.

**41.** Brief for Appellant at 9.

**42.** Brief for Appellant at 9. At oral argument, Williams' counsel advised the court that he was not protesting any police activity prior to seizure of the bag.

**43.** Brief for Appellant at 9.

**44.** U.S. Const. amend. IV.

**45.** *United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85, 94 (1983) (footnote omitted); see also *Maryland v. Macon,* 472 U.S. 463, 469, 105 S.Ct. 2778, 2782, 86 L.Ed.2d 370, 377 (1985); *Garmon v. Foust,* 741 F.2d 1069, 1072 (8th Cir.1984).

**46.** See, e.g., *United States v. Place,* 462 U.S. 696, 701, 103 S.Ct. 2637, 2641, 77 L.Ed.2d 110, 116–117 (1983); *United States v. Licata,* 761 F.2d 537, 540 (9th Cir.1985); *Lavicky v. Burnett,* 758 F.2d 468, 474 (10th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 882, 88 L.Ed.2d 917 (1986).

**47.** See Brief for Appellees at 10–17.

**48.** 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

**49.** See text *infra* at notes 50–54.

**50.** *United States v. Denney,* 771 F.2d 318, 321 (7th Cir.1985) (quoting *Terry v. Ohio, supra* note 48, 392 U.S. at 21, 88 S.Ct. at 1879, 20 L.Ed.2d at 905–906); see also *United States v. Streifel,* 781 F.2d 953, 957 (1st Cir.1986).

**51.** *Terry v. Ohio, supra* note 48, 392 U.S. at 30, 88 S.Ct. at 1884, 20 L.Ed.2d at 911.

**52.** *Id.*

**53.** 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983).

ger compartment of the vehicle in which a weapon might be concealed.[54]

Williams concedes that *Terry* and *Long* would validate the seizure of the bag had it occurred in the course of a weapons search, but argues that the officers appropriated the bag "not as a protective measure, but rather as an exploration for drugs." [55] Williams maintains that the officers' actions belie their contention that they feared the bag might contain a weapon since they permitted him to exit the car before grabbing the bag, and did not draw their weapons.[56]

As Williams correctly notes, if the real aim of the search was discovery or preservation of contraband rather than immobilization of weapons, the intrusion was not authorized by *Terry* or *Long*.[57] On the same day *Terry* was decided, the Supreme Court held that contraband seized in a search of the defendant had to be suppressed because the "search was not reasonably limited in scope to the accomplishment of the only goal which might conceivably have justified its inception—the protection of the officer by disarming a poten-

tially dangerous man." [58] Similarly, the *Long* Court was careful to point out that its holding did "not mean that the police may conduct automobile searches *whenever* they conduct an investigative stop;" rather, automobile searches are allowable "only when [the police] have the level of suspicion identified in *Terry*." [59] The issue therefore turns on whether the officer "possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." [60]

Applying these principles to the facts before us, we are satisfied that there is sufficient record evidence to sustain the District Court's holding that Kass' seizure of the bag was lawful. Kass testified that at the time he asked Williams to alight from the car, he feared that the bag contained a weapon.[61] Williams' attempts to conceal the bag could easily and naturally have caused the officer even greater anxi-

---

54. *Id.* at 1049, 103 S.Ct. at 3481, 77 L.Ed.2d at 1220; see also *United States v. Roy,* 734 F.2d 108, 114 (2d Cir.1984) (concurring opinion); *United States v. Denney, supra* note 50, 771 F.2d at 321; *United States v. Williams,* 714 F.2d 777, 781 n. 5 (8th Cir.1983); *United States v. Aldridge,* 719 F.2d 368, 372 (11th Cir.1983). We had earlier adopted a similar approach in *United States v. Wilkerson,* 194 U.S.App.D.C. 393, 397, 598 F.2d 621, 625 (1978), which authorized protective searches of passenger compartments during *Terry* stops where officers have reasonable suspicion that a weapon is present.

55. Brief for Appellant at 15.

56. *Id.* at 15–16.

57. See, e.g., *United States v. Gonzalez,* 763 F.2d 1127, 1130 n. 1 (10th Cir.1985).

58. *Sibron v. New York,* 392 U.S. 40, 65, 88 S.Ct. 1889, 1894, 20 L.Ed.2d 917, 936 (1968).

59. *Michigan v. Long, supra* note 53, 463 U.S. at 1049–1050 n. 14, 103 S.Ct. at 3481 n. 14, 77 L.Ed.2d at 1220 n. 14 (emphasis in original).

60. *Id.* at 1049–1050, 103 S.Ct. at 3481, 77 L.Ed.2d at 1220 (quoting *Terry v. Ohio, supra* note 48, 392 U.S. at 21, 88 S.Ct. at 1880, 20 L.Ed.2d at 899). In applying this standard, the

*Long* Court specifically rejected the notion that a check for weapons becomes impermissible once a suspect leaves the car and is thus "in the control" of the police. 463 U.S. at 1051–1052, 103 S.Ct. at 3482, 77 L.Ed.2d at 1221–1222; see also *United States v. Roy, supra* note 54, 734 F.2d at 114 (concurring opinion); *United States v. Aldridge, supra* note 54, 719 F.2d at 372. The *Long* Court reasoned that

> [j]ust as a *Terry* suspect on the street may, despite being under the brief control of a police officer, reach into his clothing and retrieve a weapon, so might a *Terry* suspect in *Long*'s position break away from police control and retrieve a weapon from his automobile. In addition, if the suspect is not placed under arrest, he will be permitted to reenter his automobile, and he will then have access to any weapons inside.

*Michigan v. Long, supra* note 53, 463 U.S. at 1051–1052, 103 S.Ct. at 3482, 77 L.Ed.2d at 1221 (citations omitted).

61. See note 22 *supra* and accompanying text. We must assume that the District Court gave substantial weight to Kass' testimony in ruling on the motion to suppress. See note 39 *supra.* It would have been entirely reasonable to do so, since Williams made no attempt to controvert that officer's account of the incident. See note 2 *supra.*

ety.[62] In light of these circumstances, the District Court could reasonably conclude that Kass was motivated by a well-founded concern for his own safety and that of his fellow officers at the time he took charge of the bag.

## C. *The Opening of the Bag*

Kass did not cease his examination of the paper bag after removing it from the car; instead, he proceeded to open it.[63] Williams contends that even if Kass was legally authorized to seize the bag and had probable cause to believe that narcotics were contained therein,[64] he could not search the bag without a warrant.[65]

■ Like warrantless seizures, warrantless searches "are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions."[66] One bearing on the present case is the so-called automobile exception, which permits a search of a motor vehicle without a warrant provided there is probable cause.[67] In *United States v. Ross*,[68] the Supreme Court ruled that a law-enforcement officer who has probable cause to believe that an automobile contains contraband may conduct a warrantless search "of every part of the vehicle and its contents that may conceal the object of the search."[69] The *Ross* Court, however, took pains to distinguish prior cases[70] holding that a probable cause belief that a discrete container within the vehicle conceals contraband will not support a warrantless search of that container under the automobile exception.[71] We ourselves have relied upon the distinction made in *Ross*,[72] and other circuits have employed the same analysis.[73] Thus we

**62.** The District Court characterized Williams' "activities" as being "furtive and suspicious." Tr. 65. Furtive gestures may suggest that the suspect is armed, and have been held to provide ample ground to conduct a *Terry* weapons search. See, e.g., *United States v. Denney, supra* note 50, 771 F.2d at 322 (weapons check authorized where suspect made "furtive gestures in moving or leaning toward the right side of the truck"); *United States v. Pajari,* 715 F.2d 1378, 1384 (8th Cir.1983) (weapons check authorized where officers saw suspect "reach down with his hands toward his feet" as they approached car).

**63.** See text *supra* at note 33.

**64.** Williams concedes both of these points for purposes of this argument. Brief for Appellant at 16.

**65.** Brief for Appellant at 16–17.

**66.** *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576, 585 (1967) (footnote omitted); see also *Thompson v. Louisiana,* 469 U.S. 17, 19–20, 105 S.Ct. 409, 410, 83 L.Ed.2d 246, 250 (1984) (per curiam); *Fludd v. United States Secret Serv.,* 248 U.S.App.D.C. 357, 361, 771 F.2d 549, 553 (1985); *Ellsberg v. Mitchell,* 228 U.S.App.D.C. 225, 240, 709 F.2d 51, 66 (1983); *United States v. Lyons,* 227 U.S.App.D.C. 284, 292, 706 F.2d 321, 329 (1983); *United States v. McEachin,* 216 U.S.App.D.C. 320, 325, 670 F.2d 1139, 1144 (1981).

**67.** See generally *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed.2d 543 (1925); *United States v. Whitfield,* 203 U.S.App.D.C. 102, 629 F.2d 136 (1980), *cert.*

*denied,* 449 U.S. 1086, 101 S.Ct. 875, 66 L.Ed.2d 812 (1981).

**68.** 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982).

**69.** *Id.* at 825, 102 S.Ct. at 2173, 72 L.Ed.2d at 594.

**70.** *Id.* at 814, 102 S.Ct. at 2167, 72 L.Ed.2d at 587.

**71.** See *Arkansas v. Sanders,* 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979); *United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977).

**72.** See *United States v. Caroline,* 253 U.S.App. D.C. 26, 791 F.2d 197 (1986). As we explained in that case,

> [t]he [Ross] Court distinguished cases such as *United States v. Chadwick* and *Arkansas v. Sanders,* explaining that in those cases the police did not have probable cause to "search the vehicle or anything within it except the footlocker in the former case and the green suit case in the latter." In *Ross,* by contrast, the probable cause went to the entire vehicle, and the Court held that the police could open any container within the vehicle in which the sought after contraband might have been hidden.

*Id.* at 31, 791 F.2d at 202 (quoting *United States v. Ross, supra* note 68, 456 U.S. at 814, 102 S.Ct. at 2167, 72 L.Ed.2d at 587).

**73.** Compare *United States v. Mazzone,* 782 F.2d 757, 761 (7th Cir.), *cert. denied,* — U.S. —, 107 S.Ct. 141, 93 L.Ed.2d 84 (1986) (if "the

readily agree with Williams that, because the two police officers did not have probable cause to search the vehicle or anything within it other than the bag, the automobile exception did not authorize Kass to open it.

This is not the end of our inquiry, however. To establish the admissibility of the contents of the bag, the Government need only show that the search was authorized by one of the exceptions to the warrant requirement;[74] it need not meet the demands of all of the exceptions. Thus we turn to a consideration of other doctrines that might legitimate the search.

The Government's principal contention in this regard [75] is that the warrantless opening of the bag was proper because its contents were already apparent to Kass, the officer who examined it. This claim rests on a footnote in *Arkansas v. Sanders*,[76] a case in which the Supreme Court held the automobile exception inapplicable to the warrantless search of a suitcase found in the trunk of a taxicab. Since probable cause extended only to the container and not to the entire vehicle, the Court reasoned, the search of the suit case violated the Fourth Amendment.[77] The *Sanders* Court, however, limited its holding:

> Not all containers and packages found by police during the course of a search will deserve the full protection of the Fourth Amendment. Thus, some containers (for example a kit of burglar tools or a gun case) by their very nature cannot support any reasonable expectation of privacy because their contents can be inferred from their outward appearance. Similarly, in some cases the contents of a package will be open to "plain view," thereby obviating the need for a warrant.[78]

Advertently to this limiting consideration, courts have upheld the warrantless opening of containers bearing labels identifying their contents [79] and containers that

police have probable cause only to believe that the container contains contraband they cannot ... dispense with the usual requirement ... that a sealed container may not be opened without its owner's permission or a search warrant") with *United States v. Marin*, 761 F.2d 426, 430 (7th Cir.1985) ("under the automobile exception to the warrant requirement, if a law enforcement officer has probable cause to believe that an automobile contains contraband, the officer may conduct a search as though he had a warrant"). See also *United States v. Stewart*, 770 F.2d 825, 829 (9th Cir.1985), *cert. denied,* — U.S. ——, 106 S.Ct. 888, 88 L.Ed.2d 922 (1986). See generally 2 W. LaFave, Search & Seizure § 7.2, at 243 (Supp.1986).

**74.** See *Stoner v. California,* 376 U.S. 483, 486, 84 S.Ct. 889, 891, 11 L.Ed.2d 856, 859 (1964) (warrantless search " 'can survive constitutional inhibition only upon a showing that the surrounding facts brought it within one of the exceptions to the rule that a search must rest upon a search warrant' ") (quoting *Rios v. United States,* 364 U.S. 253, 261, 80 S.Ct. 1431, 1436, 4 L.Ed.2d 1688, 1693 (1960)); *United States v. Lyons, supra* note 66, 227 U.S.App.D.C. at 292, 706 F.2d at 329; C. Whitebread, Criminal Procedure § 4.03, at 102 (1980).

**75.** See Brief for Appellees at 18–19. The Government makes an additional argument that we feel compelled to address briefly. Drawing on language in *Michigan v. Long, supra* note 53, the Government claims that the fact that the bag was closed is constitutionally irrelevant, and that Kass' authority to take possession of the bag on an investigative stop also extended to allow him to open it. Brief for Appellees at 18 & n. 15. The language quoted from *Michigan v. Long,* however, relates not to the permissible scope of a *Terry* check for weapons but to a search incidental to a valid arrest, e.g., *Chimel v. California,* 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685, 694 (1969). See *Michigan v. Long, supra* note 53, 463 U.S. at 1048–1049, 103 S.Ct. at 3480, 77 L.Ed.2d at 1219. Since the Government does not even contend that the officers had probable cause to arrest Williams at the time they seized the bag, this exception to the warrant requirement clearly does not apply. Moreover, the suggestion that *Terry* and *Long* authorized the opening of the bag is defeated by Kass' testimony that, at the moment before he did so, he thought that it contained heroin rather than a weapon. See text *supra* at notes 30–32.

**76.** *Supra* note 71.

**77.** 442 U.S. at 755, 765, 99 S.Ct. at 2588, 2594, 61 L.Ed.2d at 239, 246. This decision was distinguished in *United States v. Ross, supra* note 68. See notes 70–73 *supra* and accompanying text.

**78.** *Arkansas v. Sanders, supra* note 71, 442 U.S. at 764–765 n. 13, 99 S.Ct. at 2593 n. 13, 61 L.Ed.2d at 245 n. 13 (citing *Harris v. United States,* 390 U.S. 234, 236, 88 S.Ct. 992, 993, 19 L.Ed.2d 1067, 1069 (1968) (per curiam)).

**79.** See *United States v. Morgan,* 744 F.2d 1215, 1222 (6th Cir.1984); *United States v. Eschweiler,* 745 F.2d 435, 440 (7th Cir.1984), *cert. denied,*

were transparent or partially open.[80] One commentator has described the "main thrust" of the *Sanders* footnote as "a distinction between containers that 'proclaim their contents' ... and those that do not."[81] In this sense, the footnote can best be understood as a specific application of a well-established principle of Fourth Amendment jurisprudence: apprehension of that which is already in plain view of an officer lawfully present at his vantage point does not infringe any reasonable expectation of privacy, and its exposure thus is not a search within the meaning of the Fourth Amendment.[82]

The Government does not contend that the "very nature" of a paper bag is such that, like the gun case noted in *Sanders*, it proclaims its contents and thus dispels any reasonable expectation of privacy. Instead, the Government points to the last-quoted sentence of the *Sanders* footnote and argues that Kass' lawful touching of

the bag rendered its contents so apparent to him as to bring them into his "plain view."[83] The question thus posed is whether the doctrine recognized in *Sanders* is applicable if a police officer's knowledge of the contents of a container derives, not from his sense of sight, but from his sense of touch.

We are guided in this inquiry both by decisions interpreting the *Sanders* footnote and caselaw applying the more general "plain view" principles.[84] Taken together, these cases establish that no reasonable expectation of privacy attaches to containers whose contents are readily discernible through use of some sense other than sight.[85] Courts thus have extended "plain view" principles to encompass "plain touch,"[86] "plain smell,"[87] and "plain hearing."[88]

Our decision in *United States v. Russell*[89] is illustrative of the analogous application of plain view principles to situa-

---

469 U.S. 1214, 105 S.Ct. 1188, 84 L.Ed.2d 334 (1985) ("a container that proclaims its contents on the outside is not a private place").

**80.** See *Tillman v. State,* 275 Ark. 275, 630 S.W.2d 5 (1982), *cert. denied,* 459 U.S. 1201, 103 S.Ct. 1185, 75 L.Ed.2d 432 (1983) (garment bag partially open, revealing stolen goods); *State v. Schrier,* 283 N.W.2d 338 (Iowa 1979) (clear plastic bag protruding from knapsack); *Commonwealth v. Irwin,* 391 Mass. 765, 463 N.E.2d 1178 (1984); see also 2 W. LaFave, *supra* note 73, § 7.2, at 254.

**81.** Y. Kamisar, *The "Auto Search" Cases: The Court Does Little to Clarify the "Labyrinth" of Judicial Uncertainty,* in J. Choper, Y. Kamisar & L. Tribe, The Supreme Court: Trends and Developments 1980–1981 at 104 (1982).

**82.** See *New York v. Class,* 475 U.S. 106, ——, 106 S.Ct. 960, 966, 89 L.Ed.2d 81, 90 (1986) ("[i]t is unreasonable to have an expectation of privacy in an object required by law to be located in a place ordinarily in plain view from the exterior of [an] automobile"); 1 W. LaFave, Search & Seizure § 2.2, at 240 (1978); Fifteenth Annual Review of Criminal Procedure: United States Supreme Court and Courts of Appeals, 74 Geo. L.J. 499, 503 (1986).

As Professor LaFave explains, courts and commentators use the phrase "plain view" to refer to two distinct legal doctrines. First, the term is employed in conjunction with the principle that officers do not perform searches within the meaning of the Fourth Amendment when they discover something through use of their senses from a vantage point at which their pres-

ence is constitutionally permissible. See, e.g., *Arizona v. Hicks,* —— U.S. ——, 107 S.Ct. 1149, 1153, 94 L.Ed.2d 347 (1987) ("a truly cursory inspection—one that involves merely looking at what is exposed to view, without disturbing it—is not a 'search' for Fourth Amendment purposes"). It is this prong of the plain view doctrine that the *Sanders* footnote invokes. The term refers additionally to the principle, first enunciated in *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) (plurality opinion), that a warrantless seizure of an item in plain view passes constitutional muster where there has been a prior valid intrusion, the evidentiary nature of the item is immediately apparent, and the discovery is inadvertent. Compare 1 W. LaFave, *supra,* § 2.2, at 240 with *id.* at 241–242.

**83.** Brief for Appellees at 18.

**84.** The matter is discussed both in nonsearch plain view situations and those involving plain view seizures. See note 82 *supra.*

**85.** See text *infra* at notes 89–105.

**86.** See text *infra* at notes 89–104.

**87.** See note 105 *infra.*

**88.** See note 105 *infra.*

**89.** 211 U.S.App.D.C. 31, 655 F.2d 1261 (1981) (*Russell I*), *modified and vacated in part,* 216 U.S.App.D.C. 165, 670 F.2d 323 (*Russell II*), *cert. denied,* 457 U.S. 1108, 102 S.Ct. 2909, 73 L.Ed.2d

tions involving use of the sense of touch. When, during an investigative stop of an automobile, a suspect opened the glove compartment to obtain identification, a police officer observed two packets that appeared to contain contraband.[90] While searching the vehicle for additional contraband pursuant to the automobile exception to the warrant requirement,[91] the officer felt the outline of a gun as he "drew [a] paper bag out from under the seat," [92] and he then proceeded to open the bag. Although we assumed that the warrantless opening of the bag was not within the scope of the automobile exception,[93] we held that no warrant was required to "uncover[ ] what [the officer's] sense of touch revealed." [94] In denying Russell's petition for rehearing,[95] we subsequently explain that plain view "encompasses 'plain touch.'" [96]

Three sister circuits also have recognized the "plain touch" analogue.[97] The Second Circuit first approved it in *United States v. Diaz*,[98] a decision assaying the propriety of a warrantless examination of a paper bag found stuffed into the tank of a toilet.[99] The court was unable to determine from the record whether stolen currency found in the bag was "perceptible by sight or touch" when seized,[100] but noted that if the contents were capable of such identification they were properly subject to a plain view seizure.[101] In a subsequent decision relying on *Diaz*, the Second Circuit held that where a drug-enforcement agent "was able readily to identify [the] contents [of a paper bag] simply by feeling the outside of the bag.... [I]t would be a pointless formality to require that the agents first obtain a warrant before examining the contents." [102] The Fourth [103] and Ninth [104] Circuits also have considered plain touch a necessary corollary to the plain view doctrine.[105]

1317 (1982). *Russell II* centered on an aspect of the appeal other than the plain touch issue, but affirmed *Russell I*'s analysis on this point. See *Russell II*, 216 U.S.App.D.C. at 167, 670 F.2d at 325.

90. *Russell I, supra* note 89, 211 U.S.App.D.C. at 33, 655 F.2d at 1263.

91. *Id.*

92. *Id.* at 34, 655 F.2d at 1264.

93. *Russell* was decided before the Supreme Court's decision in *United States v. Ross, supra* note 68. We relied on the understanding prevailing in this circuit after *Arkansas v. Sanders, supra* note 71, that the automobile exception did not permit the opening of containers. *Russell I, supra* note 89, 211 U.S.App.D.C. at 34, 655 F.2d at 1264.

94. *Russell I, supra* note 89, 211 U.S.App.D.C. at 34, 655 F.2d at 1264.

95. See note 89 *supra.*

96. *Russell II, supra* note 89, 216 U.S.App.D.C. at 169, 670 F.2d at 325 (citations omitted).

97. See text *infra* at notes 98–104. Similarly, this principle has been accepted by a number of commentators. Professor LaFave states the point this way: "assuming lawful physical contact with [a] container, [ ] 'plain touch' may reveal its contents so unquestionably that ... no warrant requirement exists merely because there is a container between the officer and the seizable object." 2 W. LaFave, *supra* note 73,

§ 7.2, at 254. Professor Kamisar has noted his agreement with the "view that 'plain view' probably means 'plain touch'" as well, Y. Kamisar, *supra* note 81, at 105, and has defined the *Sanders* footnote as including containers that proclaim their contents by their "feel," *id.* at 104. See also J. Hall, Search & Seizure § 3.14, at 14 (Supp.1986) ("a touching may produce a 'plain feel'").

98. 577 F.2d 821 (2d Cir.1978).

99. *Id.* at 822, 824.

100. *Id.* at 824.

101. *Id.*

102. *United States v. Ocampo,* 650 F.2d 421, 429 (2d Cir.1981).

103. *United States v. Norman,* 701 F.2d 295, 296 (4th Cir.), *cert. denied,* 464 U.S. 820, 104 S.Ct. 82, 78 L.Ed.2d 92 (1983).

104. *United States v. Portillo,* 633 F.2d 1313 (9th Cir.1980), *cert. denied,* 450 U.S. 1043, 101 S.Ct. 1763, 68 L.Ed.2d 241 (1981).

105. The same course of reasoning has led a number of federal courts to conclude that plain view principles encompass the use of the sense of smell. See *United States v. Lueck,* 678 F.2d 895, 903 (11th Cir.1982) (contents of packages were "inferrable" within the meaning of the *Sanders* footnote where, *inter alia,* the "pack-

■ In light of this authority, we endorse even more strongly our earlier conclusion in *Russell*,[106] that no warrant is needed for an opening of a container whose contents become known through a lawful touching of the outside.[107] We pause, however, to note three limitations on this principle.

■ First, the "plain touch" exception only applies where an officer is legally authorized to touch the container in the first place.[108] In *Russell*, for example, the container was handled in the course of a lawful automobile search.[109] As in traditional plain view situations, if the officers do not lawfully occupy the vantage point from which their observations are made they cannot rely upon plain touch as justification for a search.[110]

The requirement of a lawful "vantage point" suggests a corollary limitation: the doctrine would not sanction any use of the sense of touch beyond that justified by the initial contact with the container.[111] For example, an officer who satisfies himself while conducting a *Terry* check that no weapon is present in a container is not free to continue to manipulate it in an attempt to discern the contents.[112]

Finally, we note a third limitation on the principle: the contents of a package cannot be deemed in plain view unless a lawful touching convinces the officer to a reasonable certainty that the container holds contraband or evidence of a crime. This situation is clearly distinguishable from one involving a plain view seizure.[113] Probable

---

ages reeked of marijuana"); *United States v. Turbyfill*, 373 F.Supp. 1372, 1375 (W.D.Mo.1974) ("the plain view doctrine has been expanded somewhat ... to include a 'fresh smell' doctrine"), *aff'd*, 525 F.2d 57 (8th Cir.1975); *United States v. Pagan*, 395 F.Supp. 1052, 1061 (D.P.R. 1975) (plain view "doctrine has been expanded to cover that evidence that can be perceived by the sense of smell"), *aff'd*, 537 F.2d 554 (1st Cir.1976); see also *United States v. Norman*, *supra* note 103, 701 F.2d at 297; *United States v. Haley*, 669 F.2d 201, 203–204 & n. 3 (4th Cir.), *cert. denied*, 457 U.S. 1117, 102 S.Ct. 2928, 73 L.Ed.2d 1329 (1982); *United States v. Sifuentes*, 504 F.2d 845, 848 (4th Cir.1974). This "plain smell" doctrine has been rejected by some courts, however. See, e.g., *United States v. Johns*, 707 F.2d 1093, 1096 (9th Cir.1983) ("while the odor of marijuana smelled by [law enforcement] agents would contribute to probable cause" it did not constitute "a recognized exception to the warrant requirement [sufficient] to justify a warrantless search"), *rev'd on other grounds*, 469 U.S. 478, 105 S.Ct. 881, 83 L.Ed.2d 890 (1985); see also *Blair v. United States*, 665 F.2d 500, 513 (4th Cir.1981) (dissenting opinion). Courts refusing to recognize the "plain smell" exception have noted that the "fleeting and evanescent" nature of odors renders it almost impossible for a court considering a motion to suppress to evaluate them. *Id.* This complaint cannot be registered against tactile information, which generally can be preserved for trial. See Brief for Appellees at 13 n. 12 (the District Court was given an opportunity to evaluate the paper bag and its contents).
 Another recognized analogue of the plain view doctrine, which might be termed "plain hearing," is the venerable principle whereby statements overheard without the benefit of listening devices by police officers stationed at a lawful vantage point are admissible for proper purposes at trial. See *United States v. Jackson*,

588 F.2d 1046 (5th Cir.), *cert. denied*, 442 U.S. 941, 99 S.Ct. 2882, 61 L.Ed.2d 310 (1979); *United States v. Fisch*, 474 F.2d 1071 (9th Cir.), *cert. denied*, 412 U.S. 921, 93 S.Ct. 2742, 37 L.Ed.2d 148 (1973).

106. *Supra* note 89.

107. See text *supra* at notes 93–96.

108. See, e.g., 2 W. LaFave, Search & Seizure, § 7.2, at 254 (2d ed. 1985) (doctrine requires "lawful physical contact with the container").

109. *Russell I, supra* note 89, 211 U.S.App.D.C. at 33, 655 F.2d at 1263.

110. See note 82 *supra*.

111. See note 110 *supra*; see also *United States v. Portillo, supra* note 104, 633 F.2d at 1315 (noting that officer felt gun "immediately" upon touching bag); cf. *Arizona v. Hicks, supra* note 82, —— U.S. at ——, 107 S.Ct. at 1152 ("the 'distinction between "looking" at a suspicious object ... and "moving" it a few inches' is much more than trivial for purposes of the Fourth Amendment") (quoting *id.* at ——, 107 S.Ct. at 1157 (dissenting opinion)).

112. See *State v. Ortiz*, 4 Haw.App. 143, 662 P.2d 517, 532 (1983), *aff'd on other grounds*, 67 Haw. 181, 683 P.2d 822 (1984) (knowledge of the contents of container must be "coincidental" with lawful touching); cf. *United States v. Portillo, supra* note 104, 633 F.2d at 1315 (noting that officer felt gun "immediately" upon touching container).

113. See note 82 *supra*. In *Arizona v. Hicks*, *supra* note 82, the Supreme Court declared that probable cause to seize an object in plain view

cause—a predictive judgment that further investigation will yield particular results—suffices to exempt the seizure from Fourth Amendment warrant requirements.[114] In the present type of situation the information in 'plain view' must be good enough to eliminate all need for additional search activity.[115] This can only occur when sensory information acquired by the officer rises to a state of certitude, rather than mere prediction, in regard to the object of the investigation.[116] This level of conviction must be objectively reasonable in light of the officer's past experience and training,[117] and capable of verification by a reviewing court.

■ We believe this is a proper case for invocation of the plain touch exception, for we find in the record sufficient evidence to meet the criteria discussed above.[118] We have already concluded that Kass' appro-

would also entitle police officers to "move[] it for closer examination." — U.S. at ——, 107 S.Ct. at 1153. On this basis, the Court concluded that if the officers had possessed probable cause to believe that stereo equipment found in Hicks' apartment was stolen, they would have been justified in moving the components to expose their serial numbers. *Id.* As we read *Hicks,* however, it does not conflate plain view search and seizure in cases involving closed containers. The Court has repeatedly held that probable cause to believe that a container in a vehicle holds contraband—in effect, probable cause to seize the container—will not justify a warrantless opening thereof. *Arkansas v. Sanders, supra* note 71, 442 U.S. at 755, 765, 99 S.Ct. at 2588, 2594, 61 L.Ed.2d at 239, 246; *United States v. Chadwick, supra* note 71, 433 U.S. at 11, 97 S.Ct. at 2483, 53 L.Ed.2d at 548; see also *United States v. Ross, supra* note 68, 456 U.S. at 814, 102 S.Ct. at 2167, 72 L.Ed.2d at 587. See notes 68–73 *supra* and accompanying text. The *Hicks* court does not address those rulings, and we are not persuaded that it intended to overrule these well-embedded precedents *sub silentio.*

114. In a case decided this term, the Supreme Court held that probable cause is required to justify a plain view seizure. *Arizona v. Hicks, supra* note 82, — U.S. at ——, 107 S.Ct. at 1153. The majority observed that any lesser justification would "cut the 'plain view' doctrine loose from its theoretical and practical moorings." *Id.* Prior to *Hicks,* the justification needed to exempt a seizure from the warrant requirement was unclear. In *Coolidge v. New Hampshire, supra* note 82, a plurality of the Court authorized a warrantless seizure of containers only when it was "immediately apparent" that they contained contraband. 403 U.S. at 466, 91 S.Ct. at 2038, 29 L.Ed.2d at 583. In *Texas v. Brown,* 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983), another plurality of the Court concluded that the "immediately apparent" language of *Coolidge* did not require that an officer "know" that seized items are contraband or evidence of crime; instead, " *'probable cause to associate the property with criminal activity'* " was sufficient. *Id.* at 741, 103 S.Ct. at 1543, 75 L.Ed.2d at 513 (plurality opinion) (quoting *Payton v. New York,* 445 U.S. 573, 587, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639, 651 (1980)) (emphasis supplied by *Brown* plurality opinion). Justices Blackmun and Powell, while condemning the plurality's retreat from the *Coolidge* standard, concurred in the judgment. *Id.* at 746, 103 S.Ct. at 1546, 75 L.Ed.2d at 517 (Powell, J., concurring in the judgment). Justices Brennan, Marshall and Stevens also joined in the judgment and agreed that probable cause sufficed for seizure of the container, but emphasized that the plain view doctrine espoused in *Coolidge* did not "justify opening [the container] without a warrant." *Id.* at 750, 103 S.Ct. at 1547–1548, 75 L.Ed.2d at 751 (Stevens, J., concurring in the judgment) (footnote omitted).

115. See notes 82, 114 *supra.*

116. *Texas v. Brown, supra* note 114, 460 U.S. at 751 & n. 5, 103 S.Ct. at 1548 & n. 5, 75 L.Ed.2d at 520 & n. 5 (Stevens, J., concurring in the judgment) (virtual certainty required to justify warrantless opening of container); *United States v. Miller,* 769 F.2d 554, 561 (9th Cir.1985) (concurring opinion) ("a far greater degree of certainty is required for a warrantless search of a container than the probable cause necessary to seize it") (citing *Texas v. Brown, supra* note 114 (Stevens, J., concurring in the judgment)). Professor LaFave has supported this view on the ground that unless more than mere probable cause is required, the *Sanders* footnote "would completely swallow[] the *Sanders* rule." 2 W. LaFave, *supra* note 73, § 7.2, at 256.

117. See *Texas v. Brown, supra* note 114, 460 U.S. at 746, 103 S.Ct. at 1545, 75 L.Ed.2d at 517 (Powell, J., concurring in the judgment) ("we have recognized that a law enforcement officer may rely on his training and experience to draw inferences and make deductions that might well elude an untrained person") (citation omitted).

118. While an accused is entitled to factual findings addressing each of the limiting principles—for they certainly constitute "essential findings" in a plain touch analysis, see Fed.R.Crim.P. 12(e)—Williams waived that right, and we must uphold the court's ruling if we find that the evidence can reasonably be viewed as satisfying the plain touch requirements. See note 39 *supra.*

priation of the bag was lawful,[119] and so we find that his initial vantage point was proper. Next, there is nothing in the record to establish that Kass continued to manipulate the container after it became apparent that no weapon was present.[120] Finally, there is record evidence to support the conclusion that Kass' handling of the bag left him reasonably certain that contraband was contained therein.[121] Accordingly, we find that the District Court's denial of the motion to suppress was proper.[122]

## II. THE MOTION FOR MISTRIAL

### A. *Background*

Williams' second claim of error stems from remarks addressed by a defense witness to three jurors at the end of the first day of deliberations. On the morning following, the District Court, with the approval of counsel on both sides, questioned the foreman of the jury outside the hearing of the other jurors to ascertain the nature of these events.[123] Through this colloquy the details were revealed.

Two jurors were approached by a defense witness on the night before as they were leaving the courthouse.[124] The witness inquired as to whether they had reached a verdict; the jurors did not respond and continued walking down the corridor.[125] The witness then stated that the only reason the jurors had not reached a verdict was that they wished to return in order to collect additional fees.[126] The

foreman informed the court that a third juror reported a similar experience with the same witness, and that all of the jurors had learned about these encounters.[127]

Following this colloquy, defense counsel claimed that these confrontations were prejudicial to Williams and sought a mistrial.[128] The court, observing that "[a]pparently there [was] no attempt to threaten them or otherwise influence their verdict," [129] denied this request but explained how he proposed to alleviate any risk of prejudice:

> I think its the kind of thing that I am going to try to neutralize by an admonition to the jury. I want them to clearly understand that this is their business, and when I gave them the case I told them I wanted them to take it and give it the same careful consideration they would give any other important matter in their own lives, and I wanted them to remember that. I will ask whether they can continue to do that without regard to any remarks that were made to these people....
>
> I think that's a good enough prophylactic.[130]

The court accorded counsel on both sides an opportunity to comment on his proposal. The prosecutor expressed approval.[131] Williams' counsel again requested a mistrial, but agreed that if a mistrial was not

---

**119.** See notes 61–62 *supra* and accompanying text.

**120.** Kass stated that "I picked [the bag] up, and I felt it with both hands." Tr. 33. The action described by Kass can reasonably be viewed as falling within the parameters of a *Terry* weapons search.

**121.** Kass testified that he "could feel" numerous small rolledup objects and that he "believed" that the bag contained numerous quarter bags of heroin. Tr. 33–34. Asked to explain the basis for that conclusion he stated that "from feeling it I could tell it was a large amount, small rolled-up objects that felt like plastic baggies." Tr. 34.

**122.** See note 39 *supra*.

**123.** Tr. 217.

**124.** Tr. 219–220.

**125.** Tr. 219–220.

**126.** Tr. 219–220, 224–225.

**127.** Tr. 224–225.

**128.** Tr. 221. Counsel argued that Williams "would be somewhat prejudiced by what one of his witnesses did because it would seem to indicate some kind of interest," and that since the jury had to evaluate credibility these episodes damaged his case. Tr. 221.

**129.** Tr. 224.

**130.** Tr. 224–225.

**131.** Tr. 225.

granted the admonition would be appropriate.[132]

The court had the jurors returned to the courtroom. First reminding them of the instructions he had given before they began deliberations, the court asked that any jurors who thought they might be influenced by the defense witness' remarks to raise their hands.[133] None of the jurors did so.[134] The court then admonished the jurors to completely disregard the witness' remarks.[135] The jurors resumed deliberations and returned a verdict of guilty about six hours later.[136]

Williams now contends that the District Court's response to the juror-contact incidents was not sufficient to mitigate the risk of prejudice.[137] His argument is that to ensure that no juror was biased against him as a result of the witness' statements, the court should have questioned each juror individually.[138]

## B. *Weighing the Impact of Juror Contact*

In order to safeguard an accused's constitutional right to an impartial jury,[139] private communications between jurors and witnesses are absolutely forbidden.[140] In *Remmer v. United States*,[141] the Supreme Court reversed a conviction when it was shown that an unidentified person had remarked to a member of the jury during trial that the juror could profit by acquitting the defendant.[142] The Court held that, because the trial court dismissed the risk of prejudice without informing defense counsel that the communication had occurred,[143] the jury verdict could not be upheld.[144] As the Court explained,

---

132. Tr. 225, 227–228.

133. The court said to the jury:

Members of the jury, it has come to the Court's attention that someone, who was associated with this case, who was a witness, made some remarks to some of the jurors. I take it you are aware of what I am talking about.

Now, yesterday when I submitted the case to you I believe I said to you that I would like for you to take this case and consider it ... with the same care and consideration that you would give to any important piece of business in your own day-to-day lives....

I just want to ask whether or not you can continue to do that without regard to any remarks that were made to you. In other words, I want to know whether or not the remarks that were made to you yesterday by a witness would create any attitude on the part of any one of you of bias or prejudice for or against either party in this case. Do you understand my question? In other words, I want to know whether or not there is any chance that the remark that was made to you by this witness yesterday would have any effect one way or another on the process of deliberation that you are apparently engaged in.

Now, if anybody thinks that there is a problem that that remark might have infected the jury one way or another, I would like for you to show your hand.

Tr. 227–228.

134. Tr. 228.

135. Tr. 227.

136. Brief for Appellants at 6; Brief for Appellee at 25.

137. Brief for Appellant at 21; *id.* at 24–25 ("three jurors in this case were approached and criticized by one of appellant's own witnesses in a manner suggesting that not even the witness believed in appellant's innocence") (footnote omitted).

138. *Id.* at 23.

139. A federal defendant's constitutional entitlement to an impartial jury derives specifically from the Sixth Amendment and more generally from the Due Process Clause of the Fifth Amendment. *Ristaino v. Ross*, 424 U.S. 589, 595 n. 6, 96 S.Ct. 1017, 1020 n. 6, 47 L.Ed.2d 258, 263 n. 6 (1976).

140. *Mattox v. United States*, 146 U.S. 140, 150, 13 S.Ct. 50, 53, 36 L.Ed. 917, 921 (1892); *Remmer v. United States*, 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654, 656 (1954).

141. *Supra* note 140.

142. 347 U.S. at 228, 74 S.Ct. at 450–451, 98 L.Ed. at 665.

143. *Id.* After the trial judge learned of the contact, he informed the prosecuting attorney and requested the Federal Bureau of Investigation to look into the incident. After considering the FBI's report and conferring with the prosecutor, the judge concluded that the statement was made in jest and that no further action was necessary. Defense counsel learned about the communication from a newspaper account after the verdict was returned. *Id.*

144. *Id.* at 229, 74 S.Ct. at 451, 98 L.Ed. at 656.

[i]n a criminal case, any private communication, contact, or tampering ... with a juror during a trial about a matter pending before the jury is ... deemed presumptively prejudicial, if not made in pursuance of known rules of the court ... with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.[145]

The Court has later explained that *Remmer* imposes a "hearing" requirement whenever an encroachment upon the impartiality of the jury is threatened.[146]

The principles of *Remmer* have been expounded and applied by this court on nu-

merous occasions. We have considered the presumption of prejudice operable even if the communication at issue consisted only of "banter" not clearly directed at influencing the jury's verdict.[147] We have also utilized the same principles when examining incidents of juror contact in civil cases.[148]

■ It is well established that a trial court's rulings on a motion for a mistrial will be overturned only for an abuse of discretion.[149] An assessment of juror bias requires consideration of a number of factors, including the nature of the communication,[150] the length of the contact,[151] the possibility of removing juror taint by a limiting instruction,[152] and the impact of the communication on both the juror in-

**145.** *Id.* (citing *Mattox v. United States, supra* note 140, 146 U.S. at 148–150, 13 S.Ct. at 52–53, 36 L.Ed. at 920–921).

**146.** *Smith v. Phillips,* 455 U.S. 209, 215, 102 S.Ct. 940, 945, 71 L.Ed.2d 78, 85 (1982) (interpreting *Remmer v. United States, supra* note 140); see also *Remmer v. United States, supra* note 140, 347 U.S. at 229–230, 74 S.Ct. at 451, 98 L.Ed. at 656 ("[t]he trial court should not decide and take final action *ex parte* on information such as was received in this case, but should determine the circumstances, the impact thereof on the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate").

**147.** *Ryan v. United States,* 89 U.S.App.D.C. 328, 329–330, 191 F.2d 779, 781 (1951), *cert. denied,* 342 U.S. 928, 72 S.Ct. 368, 96 L.Ed. 691 (1952). Contra, *United States v. Brasco,* 516 F.2d 816, 819 (2d Cir.), *cert. denied,* 423 U.S. 860, 96 S.Ct. 116, 46 L.Ed.2d 88 (1975). Of course, though the judge must conduct an examination in such cases to determine whether the presumption of prejudice is rebutted, the innocuous nature of a contact will have great bearing on the question whether prejudice has actually occurred. See, e.g., *Jordan v. United States,* 133 U.S.App.D.C. 102, 103, 408 F.2d 1305, 1306 (1969) (affirming trial court's denial of appellant's request for a mistrial, we noted that "the conversation had been benign"); *Stewart v. United States,* 129 U.S.App.D.C. 303, 305, 394 F.2d 778, 780 (1968) (mistrial not required where "the trial judge and both trial counsel ... were satisfied that the words exchanged were unrelated to the case"); see also *United States v. Crisco,* 725 F.2d 1228, 1233 (9th Cir.), *cert. denied,* 466 U.S. 977, 104 S.Ct. 2360, 80 L.Ed.2d 832 (1984) (reviewing court will not reverse judge's denial of mistrial

"'when extraneous information relates only to issues not material to the guilt or innocence of the defendant'") (quoting *United States v. Bagnariol,* 665 F.2d 877, 887 (9th Cir.1981), *cert. denied,* 456 U.S. 962, 102 S.Ct. 2040, 72 L.Ed.2d 487 (1982); *United States v. Hines,* 696 F.2d 722, 730–731 (10th Cir.1982) (noting that challenged conduct did not involve merits of the case, and was thus harmless).

**148.** *Hobson v. Wilson,* 237 U.S.App.D.C. 219, 265, 737 F.2d 1, 47 (1984), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985).

**149.** *Id.* at 267, 737 F.2d at 49 ("[o]ur review of the trial court's ruling on the mistrial motion is limited to assuring that the judge did not abuse his discretion"); *Ryan v. United States, supra* note 147, 89 U.S.App.D.C. at 330, 191 F.2d at 781 ("[t]he standard to guide us, used by the Supreme Court, ... is whether there was an abuse of discretion in denial of a mistrial") (citations omitted); *United States v. Burke,* 496 F.2d 373, 377 (5th Cir.), *cert. denied,* 419 U.S. 966, 95 S.Ct. 229, 42 L.Ed.2d 182 (1974) ("[o]nly if we are convinced that his discretion has been abused, may we reverse the trial judge's denial of the mistrial motion"); *United States v. Fleming,* 594 F.2d 598, 608 (7th Cir.), *cert. denied,* 442 U.S. 931, 99 S.Ct. 2863, 61 L.Ed.2d 299 (1979) ("trial court did not abuse its discretion in not declaring a mistrial").

**150.** See note 147 *supra.*

**151.** See, e.g., *United States v. Hines, supra* note 147, 696 F.2d at 730–731.

**152.** See, e.g., *Jordan v. United States, supra* note 147, 133 U.S.App.D.C. at 103, 408 F.2d at 1306.

volved and the rest of the jury.[153] The trial court obviously is the tribunal best qualified to weigh the relevant factors and draw the conclusion appropriate.[154] While some communications to jurors are so inflammatory that they foster an almost conclusive presumption of prejudice,[155] in the vast majority of cases the decision will depend upon how the jury interprets and expectably will react to the communication made. Thus, in most instances, the trial court, which has a first-hand impression of that jury, is in the better position to determine whether the presumption of prejudice has been rebutted.

■ In the instant case, we cannot say that the communication at issue, after the countermeasures administered by the District Court, so jeopardized Williams' right to a fair trial that the court abused its discretion in denying his motion for a mistrial. On the contrary, we agree with the court's observation that the witness' remark was not an attempt to coerce the jury or otherwise influence its verdict.[156] Moreover, we are impressed by the fact that the

court took careful steps to defuse the risk of prejudice to Williams, inquiring into whether the defense witness' comment would affect the jurors' impartiality, admonishing them to disregard the witness' remark, and reminding them of their duty to deliberate solemnly. Given these precautions and the ambiguity of the remark, there is no basis for holding that the presumption of prejudice triggered by the witness' comment was not dispelled.[157]

Williams insists, however, that the only way the presumption of prejudice could have been rebutted would have been a polling of each juror individually on potential bias.[158] While there are times when the threat of prejudice may be significant enough to warrant separate examination of jurors, we are unwilling to adopt a per se rule that individual questioning is always required.[159] Such a rule conceivably could jeopardize the accused's rights, for in some instances individual questioning on a juror contact could cause the jurors polled to attach undue significance to the incident.[160] Moreover, because the inquiry required on

**153.** See, e.g., *Hobson v. Wilson, supra* note 149, 237 U.S.App.D.C. at 266, 737 F.2d at 48.

**154.** *United States v. Williams,* 737 F.2d 594, 612 (7 Cir.1984) (upholding trial court's finding of no prejudice; "[t]he district judge observed and worked with the jury, which he labeled 'truly extraordinary,' for many weeks").

**155.** See, e.g., *United States v. Delaney,* 732 F.2d 639, 642 (8th Cir.1984) (trial judge abused discretion in finding that communication concerning primary factual issues before jury would not prejudice defendant); see also *Mattox v. United States, supra* note 140, 146 U.S. at 150, 13 S.Ct. at 53, 36 L.Ed. at 921 ("[i]t is not open to reasonable doubt that the tendency of [a newspaper article discussing defendant's prior crimes] was injurious to the defendant").

**156.** It is now contended that the witness' comment suggested that even he was unconvinced by the Williams' case. See note 137 *supra.* We note that at trial defense counsel did not suggest this interpretation, and we are unwilling to engage in speculation over what the witness meant.

**157.** A subsequent event points up the court's wisdom in concluding that the jury would not be unduly affected by the incident. One possible fallout of the witness' remark could have been to rush to a verdict. This jury, however,

deliberated for almost six full hours following the court's admonition to disregard the remark.

**158.** Brief for Appellant at 23.

**159.** This court and others have sustained trial court findings of no prejudice without individual questioning of the jurors. *Stewart v. United States, supra* note 147, 129 U.S.App.D.C. at 305, 394 F.2d at 780; *United States v. Hines, supra* note 147, 696 F.2d at 730–731. Appellant cites a Fifth Circuit decision, *United States v. Forrest,* 620 F.2d 446 (5th Cir.1980), for the proposition that some courts expressly require that potentially affected jurors be questioned separately. Brief for Appellant at 23. A careful reading of *Forrest* discloses that it mandates individual inquiry only after the trial court finds that the contact raises significant questions of prejudice. 620 F.2d at 458. This threshold determination still requires the trial court to exercise discretion, thus even *Forrest* does not create a per se rule.

**160.** See, e.g., *United States v. Shapiro,* 669 F.2d 593, 599–603 (9th Cir.1982) (noting that the trial court's questioning on impact of an incident of juror misconduct enhanced risk of prejudice against defendant); *United States v. Ferguson,* 486 F.2d 968, 972 (6th Cir.1973) (stating that trial court's explanation why one juror was removed following incident of juror contact served to taint remaining jurors).

an instance of juror contact depends on a number of factors varying from case to case,[161] the trial court should have considerable latitude in determining the methodology to be employed.[162]

 Williams contends that *Remmer* itself mandates individual questioning to rebut the threat of juror bias.[163] We emphatically disagree. *Remmer* dictates the critical stance the trial court must take in assessing the effect of a juror contact, and requires that all reasonable doubts be resolved in favor of the accused. But this does not mean that every contact is prejudicial, or calls for the same investigative technique. What *Remmer* demands is notice to the accused of any juror contact, and an opportunity for the accused to participate in any proceeding to determine its impact.[164]

It is clear that the tenets of *Remmer* are satisfied here. Williams had ample opportunity to participate in the court's inquiry into possible bias. Williams' counsel did not request that each juror be questioned individually; indeed, he agreed that the steps the District Court proposed to take, and actually took, to alleviate the risk of prejudice were sufficient "if a mistrial is not going to be granted."[165] If Williams believed that other procedural steps were necessary to remove the risk of prejudice, he should have requested them at that time.[166]

As the Supreme Court noted almost a century ago, unauthorized communications between jurors and others are forbidden in order to safeguard the accused's constitutional right to an impartial jury.[167] But courts must not allow this protection to "delegate[ ] to every reprobate the power to effect a mistrial."[168] Some of the responsibility for dissipating the threat of prejudice must be borne by defense counsel at trial. When a contact does occur but the trial is salvageable, the court and counsel for both sides must work together to neutralize its impact. Those who are called to participate in this endeavor cannot be allowed to argue after the fact that more should have been done.

## III. Conclusion

The District Court's denial of Williams' motion to suppress must be sustained since the evidence reasonably supports a determination that the officers' investigation of the paper bag did not violate the Fourth Amendment. Moreover, the court's laudable efforts to eliminate the risk of bias following the juror contacts sufficed to buttress its conclusion that the presumption of prejudice against Williams had been overcome. The judgment appealed from is accordingly

*Affirmed.*

---

161. See notes 150–153 *supra* and accompanying text.

162. See *United States v. Barshov,* 733 F.2d 842, 852 (11th Cir.1984), *cert. denied,* 469 U.S. 1158, 105 S.Ct. 904, 83 L.Ed.2d 929 (1985) (trial court did not abuse discretion by failing to make further inquiries into charge of juror contact); cf. *Smith v. Phillips, supra* note 146, 455 U.S. at 215, 102 S.Ct. at 945, 71 L.Ed.2d at 85 (state trial court did not abuse discretion in relying on testimony of single juror to determine whether that juror was impartial).

163. Brief for Appellant at 24.

164. See note 146 *supra* and accompanying text.

165. Tr. 226.

166. Cf. *Ryan v. United States, supra* note 147, 89 U.S.App.D.C. at 331, 191 F.2d at 781 (upholding trial court's finding of no prejudice, based in part on failure of defense counsel to object to the challenged contact); *United States v. Webster,* 750 F.2d 307, 339 (1984), *cert. denied,* 471 U.S. 1106, 105 S.Ct. 2340, 85 L.Ed.2d 855 (1985) (upholding denial of mistrial for juror bias in part because defense counsel did not request cautionary instruction after contact occurred).

167. See notes 139–140 *supra* and accompanying text.

168. *United States v. Williams, supra* note 154, 737 F.2d at 612.